1    M. CANDICE BRYNER, STATE BAR NO. 192462
     TUMY N. NGUYEN, STATE BAR NO. 192268
2    LAW OFFICES OF M. CANDICE BRYNER
     A PROFESSIONAL CORPORATION
3    900 Roosevelt
     Irvine, CA 92620
4    Telephone: (949) 371-9056
     Fax: (949) 679-2492
5
     Attorneys for Plaintiff Genutec Business Solutions, Inc.
6

```
                                    FILED

                                JAN 17 2012

                        CLERK U.S. BANKRUPTCY COURT
                        CENTRAL DISTRICT OF CALIFORNIA
                        BY:                  Deputy Clerk
```

7

8                **UNITED STATES BANKRUPTCY COURT**

9      **CENTRAL DISTRICT OF CALIFORNIA, RIVERSIDE DIVISION**

10

11    In re                            )    Case No. : 6:11-bk-41390-DS

12    **LEON J. DANNA, PATRICIA S.**      )    Chapter 7
     **DANNA**                        )

13                              )    Adv. Case No. 6:12-ap-01017-DS
          Debtors.          )

14                              )    **COMPLAINT TO DETERMINE**
     ───────────────────────────── )    **DISCHARGEABILITY OF DEBT AND**

15                              )    **OBJECT TO DEBTOR'S DISCHARGE**
   **GENUTEC BUSINESS SOLUTIONS,** )    **[11 U.S.C § 523 AND 11 U.S.C. § 727]**
   **INC.**                          )

16                              )
          Plaintiff,         )

17                              )

18    vs.                            )
                             )

19    **LEON J. DANNA, PATRICIA S.**      )
   **DANNA,**                       )

20           Defendants.       )

21    ─────────────────────────────

22

23

24

25

26

27

28

**COMPLAINT TO DETERMINE DISCHARGEABILITY OF DEBT
AND OBJECT TO DEBTOR'S DISCHARGE**

Receipt # 60091471

Genutec Business Solutions, Inc. ("Plaintiff"), creditor for the bankruptcy estate of LEON J. DANNA, respectfully alleges as follows:

## STATEMENT OF JURISDICTION AND VENUE

1.    This is an adversary proceeding within the meaning of Federal Rules of Bankruptcy Procedure, Rules 7001(4) and (6).   This adversary proceeding arises in and relates to the Debtors' bankruptcy case which was filed in the Central District of California, Riverside Division on October 6, 2011, Chapter 7 Case No. 6:11-bk-41390-DS, *In re Danna* (the "Petition Date").

2.    This Court has jurisdiction over this adversary proceeding pursuant to 28 U.S.C. §§ 157 and 1334.

3.    Venue is proper in this District pursuant to 28 U.S.C. § 1409, as this adversary proceeding arises under Title 11 or arises under or relates to a case under Title 11 which is pending in this District and does not involve a consumer debt less than $5,000.

4.    This action is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(I) (determinations as to the dischargeability of particular debts) and 28 U.S.C. § 157(b)(2)(A) (matters concerning the administration of the estate) and (J) (objections to discharge).

5.    This is an action to determine the dischargeability of certain debts pursuant to 11 U.S.C. § 523(a)(4) and § 523(c)(1). This is also an action to deny Defendant Debtors discharge in the entirety pursuant to 11 U.S.C. § 727(a)(2)(A), § 727(a)(2)(D), § 727(a)(3), § 727(a)(4)(A) and § 727(a)(5).

## THE PARTIES

6.    Plaintiff Genutec Business Solutions, Inc. ("Genutec" or "Plaintiff") is a Delaware Corporation with its principal place of business located in County of Orange, State of California.

7.    Plaintiff is informed and believes and thereon alleges that the Defendants Leon J. Danna and Patricia S. Danna ("Defendants") are the Debtors in the above-entitled bankruptcy case and, at all relevant times herein, were individuals residing in the County of Riverside, State of California.

2

**COMPLAINT TO DETERMINE DISCHARGEABILITY OF DEBT
AND OBJECT TO DEBTOR'S DISCHARGE**

## GENERAL ALLEGATIONS

A.   BACKGROUND FACTS RELATING TO GENUTEC

1.   At all relevant times, Genutec provided voice broadcasting and emergency notification services for businesses, charities, political parties, municipalities and government agencies.   Genutec's dialing software permits its customers to transmit automated outbound messages and emergency notifications to business and residences throughout the United States.

2.   The calls made on behalf of Genutec's customers were generated by certain computer equipment and software, including telephone lines and associated servers and equipment ("DS3s").

3.   Defendant Leon J. Danna ("Mr. Danna") was Genutec's Chief Executive Officer and Chairman of the Board of Directors at all times between 2004 and February 27, 2007.   In that capacity, Mr. Danna participated in Genutec's acquisition of several companies.

4.   Defendant Patricia S. Danna ("Mrs. Danna") was Genutec's accounting assistant and Human Resources Manager at all times between 2004 and February 27, 2007.

5.   Genutec was cash positive in 2004 and 2005 and had record revenues and profits in the last quarter of 2005.

B.   FACTS RELATING TO MR. DANNA'S FRAUDULENT CONDUCT AND SELF-DEALING IN CONNECTION WITH THE SMART ACQUISITION

6.   In 2005, Genutec was looking to acquire Smart Development Company ("Smart"), a company owned by Johan Hendrik Smit Duyzentkunst ("Smit").   Smart was one of Genutec's competitors in the voice broadcasting business.

7.   As of that time, Genutec's goal was to acquire Smart and become a publicly traded company thereafter.   However, to finance the Smart Acquisition and become a publicly traded company, Genutec would need to borrow money from another outside source.

8.   To that end, TICC Capital Corp. and SeaView Mezzanine Fund ("Senior Lenders") were willing to loan Genutec $20,000,000.00 to finance the Smart Acquisition and to provide Genutec with the requisite capital that it needed to become a publicly traded company.

3

**COMPLAINT TO DETERMINE DISCHARGEABILITY OF DEBT
AND OBJECT TO DEBTOR'S DISCHARGE**

1    9.    With the funding lined up, Genutec entered into an Amended and Restated

2  Agreement and Plan of Merger ("Merger agreement") with Smart whereby Genutec agreed to

3  purchase most of Smart's assets, including the DS3s, the software utilized to operate the DS3s

4  and all of Smart's customer contacts.

5    10.    In connection with the Smart Acquisition, Genutec retained a law firm, Gersten

6  Savage, to conduct the requisite due diligence of Smart prior to closing the Smart Acquisition.

7    11.    Unbeknownst to Genutec, prior to the Smart Acquisition, Mr. Danna knew that

8  Smart's software was underlicensed, and would need to be completely re-written post-closing.

9  Further, Mr. Danna knew that using "underlicensed" software was improper and that going

10  public with such software could subject Genutec to liability.  Mr. Danna did not report the

11  unlicensed nature of the software, nor the fact that it would have to be completely re-written, to

12  Genutec's Board of Directors or Audit Committee prior to the Smart Acquisition.

13    12.    Prior to the Smart Acquisition, Mr. Danna was aware that there were performance

14  problems with the Smart dialing platform and software, and that the Genutec customers who had

15  used the Smart dialing platform prior to the Smart Acquisition complained about its

16  performance.

17    13.    Mr. Danna had personal motivations to ensure that the Smart Acquisition closed

18  regardless of whether it was in Genutec's best interests and regardless of whether any adequate

19  due diligence was performed since his personal company (Network Real Estate), he and his wife

20  would receive approximately $700,000 for purported loans and back-salary that would be repaid

21  to them upon the close of the Smart Acquisition.  The Danna's urgently needed this money to

22  close escrow on a luxury home in Capistrano Beach, California.  Further, this is money which

23  would not otherwise have been paid to the Debtors without the funding from the Senior Lenders

24  which hinged on the close of the Smart Acquisition.   This is because according to the terms of

25  the loan agreement with Genutec's previous lender, these sums could not be repaid to the

26  Danna's unless and until certain conditions had been met which had not been met as of

27  September 2005.

28

LAW OFFICES OF
M. CANDICE BRYNER
A PROFESSIONAL
CORPORATION

**COMPLAINT TO DETERMINE DISCHARGEABILITY OF DEBT
AND OBJECT TO DEBTOR'S DISCHARGE**

14.    Mr. Danna had other personal motivations to rapidly close the Smart Acquisition. Mr. Danna planned to make Genutec a publicly traded company and then sell his 2.3 million shares of Genutec stock to the general public through the stock exchange, along with his options to purchase an additional 1.85 million shares of Genutec stock.

15.    For Danna, proceeding with the much necessary technology due diligence was an immediate threat to the closing of the Smart Acquisition.

16.    Prior to the Smart Acquisition, Smit was growing very frustrated with the amount of due diligence that was necessary for the Smart Acquisition to close and he complained to Mr. Danna.  Smit advised Mr. Danna that if he had to endure the "pain and suffering" of "do (sic) diligence," he would not follow through with the Smart Acquisition.

17.    Mr. Danna knew that if Smit backed out of the deal and the Smart Acquisition did not close, the Danna's would not receive the $700,000 that they needed to purchase their luxury home in Capistrano Beach. Mr. Danna was well aware that upon the acquisition of Smart Development, Genutec's lender would be repaid and monies provided by the new lenders, TICC and SeaView, would permit the Danna's to receive approximately $700,000 allegedly owed to them.

18.    Therefore, without obtaining the knowledge or consent of Genutec's Board and Audit Committee, Mr. Danna instructed Gersten Savage to dramatically reduce the due diligence on the Smart Acquisition so that the Smart Acquisition would close as rapidly as possible.

19.    Only subsequent to the Smart Acquisition, and as a direct result of the failure to conduct any necessary due diligence, Genutec discovered that the Smart dialing platform used analog lines that failed to meet minimum Federal Communication Commission ("FCC") requirements applicable to telemarketers, such that the requirement that a caller transmit its caller identification.  Additionally, Genutec learned that the Smart software was not compatible with Genutec's existing dialers.  These are issues which could have been easily discovered through the necessary, but not performed, technology due diligence of the Smart dialing platform and software.

LAW OFFICES OF
M. CANDICE BRYNER
A PROFESSIONAL
CORPORATION

**COMPLAINT TO DETERMINE DISCHARGEABILITY OF DEBT
AND OBJECT TO DEBTOR'S DISCHARGE**

20.    As a result of the technical, compatibility and licensing issues with the Smart dialing platform – both preexisting issues and issues unknown to Genutec which technology and legal due diligence would have revealed -- Genutec suffered decreases in revenue, damage to goodwill, loss of acquisition and business opportunities and penalties payable to Genutec's Senior Lenders, all a result of an acquisition which would not have occurred if the necessary technology and legal due diligence had occurred.

21.    Prior to the close of the Smart Acquisition, Instant Response Marketing ("IRM") was Smart's largest customer and accounted for 60% of Smart's dialing business.  Prior to the close of the Smart Acquisition, it was essential to obtain a binding written agreement with IRM to dial exclusively with Genutec for a certain period so that Genutec would be assured to receive the financial benefit that Smart enjoyed by virtue of its long-standing business relationship with IRM.

22.    Therefore, Mr. Danna made efforts to procure a written exclusivity agreement with IRM prior to the close of the Smart Acquisition.  However, Mr. Danna was never ultimately successful in obtaining this signed written agreement from IRM.  Nevertheless, in connection with the Smart Acquisition, Mr. Danna falsely represented to Genutec's Board and Audit Committee that IRM had entered into a binding five year exclusive agreement with Genutec. Mr. Danna then authorized the issuance of 300,000 warrants for Genutec stock to the principals of IRM as consideration for this alleged exclusive agreement.  However, the true facts were that IRM had never signed or agreed to be bound by an exclusive dialing agreement with Genutec, and the Smart Acquisition closed without Genutec obtaining any such binding agreement.

23.    Genutec's Board did not actually approve the issuance of warrants to the principals of IRM until 2-3 months after the close of the Smart Acquisition.  Yet at the time of such approval, Mr. Danna withheld the fact that IRM had never actually signed the written exclusivity agreement.  The warrants were then issued to the IRM principals even though IRM did not enter into the exclusivity agreement.

24.    Further, despite the fact that IRM had not signed the exclusive agreement, Mr. Danna fraudulently booked the expense of 300,000 warrants issued to the principals of IRM as part of

6

LAW OFFICES OF
M. CANDICE BRYNER
A PROFESSIONAL
CORPORATION

COMPLAINT TO DETERMINE DISCHARGEABILITY OF DEBT
AND OBJECT TO DEBTOR'S DISCHARGE

1    the expense of the Smart Acquisition even though the warrants had not actually been issued.

2    This was done so that Mr. Danna could book the expense of the warrants as part of the purchase

3    accounting for the Smart Acquisition.

4        25.    On September 21, 2005, the Smart Acquisition closed. Genutec paid $14,000,000.00

5    inconsideration to Smit for the Smart Acquisition ($7,000,000.00 in cash and 7,000,000 in

6    stock), a price grossly more than Smart was worth. In connection with the Smart Acquisition ad

7    as a result of the funding provided by the Senior Lender, Mr. Danna's personal company and the

8    Danna's received a total of approximately $700,000.00.

9        26.    Approximately six months after the Smart Acquisition closed, in or around April

10    2006, IRM terminated its relationship with Genutec. IRM then procured its own dialing platform

11    and began to compete directly with Genutec.

12        27.    Unbeknownst to Genutec's Board and the Audit Committee, around the close of the

13    Smart Acquisition, Mr. Danna entered into a confidential agreement with third-party Tony Tseng

14    that Mr. Tseng would loan Mr. Danna the $500,000 which the Danna's needed as part of the

15    down-payment for their luxury home in Capistrano Beach. Unbeknownst to Genutec, as part of

16    the consideration for this loan, Mr. Danna urged Genutec's Board of Directors to approve the

17    issuance of warrants for Genutec's stock to Tony Tseng, which Genutec's Board did so approve.

18        28.    More particularly, on September 28, 2005, the day after Mr. Tseng and Mr. Danna

19    entered into their confidential agreement, Mr. Danna sent an email to Genutec's Audit

20    Committee recommending the issuance of Genutec warrants to Tseng. However, Mr. Danna did

21    not disclose the confidential loan agreement between Mr. Danna and Tseng. Rather, Mr. Danna

22    falsely represented to the Audit Committee that the consideration for the warrants was Mr.

23    Tseng's finder's fee for the Smart Acquisition.

24        C.    FACTS REGARDING MR. DANNA'S POST-ACQUISITION FRAUD AND

25            SELF-DEALING

26        29.    After the close of the Smart Acquisition, Genutec's financial situation began to

27    deteriorate. However, Mr. Danna made concerted efforts to conceal Genutec's financial

28    condition from the shareholders and the Senior Lenders. In that regard, Mr. Danna manipulated

LAW OFFICES OF
M. CANDICE BRYNER
A PROFESSIONAL
CORPORATION

**COMPLAINT TO DETERMINE DISCHARGEABILITY OF DEBT
AND OBJECT TO DEBTOR'S DISCHARGE**

1  Genutec's financial statements to conceal Genutec's poor financial condition from its

2  shareholders and lenders and artificially inflated Genutec's revenue by allowing customers to

3  dial without any expectation that they would pay their invoices and paying customers

4  commissions on their own dials. Mr. Danna issued shares of Genutec stock to Genutec's

5  customers as an incentive to continue to utilize Genutec's dialing services, without

6  ever obtaining the authorization or consent of Genutec's Board.

7      30.    For the purpose of artificially inflating Genutec's EBITDA, Mr. Danna purposely and

8  knowingly permitted Platinum Mortgage, a company affiliated with Tony Tseng, to dial with

9  Genutec without ever paying. Danna caused Genutec to commence dialing services for Platinum

10 Mortgage even before Platinum Mortgage had established a call center to respond to potential

11 customers who were procured through Genutec's dialing services. Mr. Danna caused Genutec to

12 enter into this fraudulent transaction so that Mr. Danna could artificially inflate Genutec's

13 revenue prior to the close of the second quarter of 2006. Despite the fact that Genutec incurred

14 the costs for such dialing services, Platinum Mortgage incurred an account receivable of over

15 $100,000 which was never paid.

16     31.    Mr. Danna also falsely recorded as revenue transactions which were uncertain,

17 unrealized and allegedly contingent upon a customer's consummation of a sale to a third party.

18 At the same time, Mr. Danna repeatedly made assurances and representations to Genutec's

19 auditors that such transactions were properly recorded as revenue and payments were imminent.

20     32.    Mr. Danna refused to stop providing dialing services to customers who were not

21 paying their bills and permitted them to run up massive receivables, all of which could be

22 recorded as revenue – at least in the short term. When Genutec retained a collection agency to

23 pursue claims against customers who were not paying, Mr. Danna interfered with and prevented

24 such claims from being submitted for collection. Further, despite his knowledge that Genutec's

25 financial statements revealed an operating loss since May 2006, and despite the fact that

26 Genutec's lenders had afforded Genutec with multiple amendments to the loan covenants to keep

27 Genutec in compliance, Mr. Danna failed to take action to prevent the company's eventual

28 insolvency and breach of the loan covenants.

8

**COMPLAINT TO DETERMINE DISCHARGEABILITY OF DEBT
AND OBJECT TO DEBTOR'S DISCHARGE**

33.    In August 2006 when Genutec was experiencing financial difficulties and was predicted to be insolvent by the end of the year, the Danna's without the knowledge or consent of Genutec's Board, increased Mr. Danna's salary from $222,000 per year to $300,000 per year.

34.    In late 2006, to stave off Genutec's insolvency and to keep Genutec in compliance with its loan covenants to the Senior Lenders, the Danna's permitted checks issued by Genutec warrant holders Ty Sisson and Thelbert Roberts to be cashed in direct contravention of the warrant holders' instructions.

35.    Additionally, rather than acting in the best interests of Genutec, Mr. Danna followed the recommendations of Chuck Arnold, the beneficial owner of a large percentage of Genutec's stock who stood to gain financially if those shares were sold upon event of Genutec becoming a publicly traded company.  In that regard, in 2007, Mr. Danna failed to disclose to the Genutec Board of Directors that Genutec had received a proposed Term Sheet from Robert Rubin. However, Mr. Danna never presented this Term Sheet to the Board of Directors for consideration because Chuck Arnold did not like Robert Rubin or the law firm which was representing Robert Rubin in connection with the Term Sheet.

36.    Mr. Danna also caused Genutec to settle various legal matters Genutec had filed against Tony Tseng and Bill King without the prior consent or authorization of Genutec's board of directors or the advice of Genutec's litigation attorney, David Outwater.  As a result of these settlements, Mr. Danna was personally rewarded for these favors, all to the detriment of Genutec. More particularly, Tseng agreed to waive Mr. Danna's obligation to pay interest on the $500,000 Note owed to Tseng for the purchase of the luxury Capistrano Beach home.  Further, Mr. Danna subsequently became a director of Alentus Corporation, a company of which Mr. King was the CEO and director.  The Danna's company PAR Group, LLC then entered into a consulting agreement with Alentus pursuant to which PAR Group was to receive $18,000 per year and 2 million in shares of Alentus stock.

37.    Finally, on the eve of the Restructuring when Genutec was insolvent, Mr. Danna voted to approve certain Indemnity Agreements between Genutec and Mr. Danna and to cause Genutec to pay to increase Genutec's Directors and Officers liability insurance coverage,

9

**COMPLAINT TO DETERMINE DISCHARGEABILITY OF DEBT
AND OBJECT TO DEBTOR'S DISCHARGE**

1    including Mr. Danna's, which was not in the best interests of Genutec, but only served to benefit

2    Mr. Danna personally.

3        **38.**    As a result of Mr. Danna's numerous acts of fraud and self-dealing misconduct,

4    Genutec has suffered damages in excess of $20,000,000.00

5        **39.**    Based upon the facts as alleged above and 11 U.S.C § 523(a)(4), Defendant Leon J.

6    Danna should not be permitted to discharge the specific debt owed to Plaintiff. In addition, based

7    upon Defendants' egregious acts, including knowingly and fraudulently making false oaths and

8    accounts in their Petition, schedules, Statement of Financial Affairs, and at the 341a Meeting of

9    Creditors, and concealing assets and information, Defendants should be denied discharge in its

10   entirety under various sections of 11 U.S.C § 727.

11                              **FIRST CLAIM FOR RELIEF**

12   **[Against Leon J. Danna for Objection to the Defendant's Discharge Of Specific Debt Based**

13      **Upon Money Obtained By Debtor's Fraud in His Capacity as a Fiduciary of Genutec]**

14                              **11 U.S.C. § 523(a)(4)**

15       **40.**    Plaintiff hereby incorporates by reference paragraphs 1 through 39, and realleges

16   these paragraphs as though set forth in full and in their entirety herein.

17       **41.**    At all relevant times to this Action, Mr. Danna served as the Chief Executive Officer

18   and Chairman of the Board of Directors of Genutec, which at all relevant times was incorporated

19   under the laws of the State of Montana.  As a director and CEO, Mr. Danna owed fiduciary

20   duties to Genutec under Montana law including, among other things, the duty to protect the value

21   of Genutec's assets.

22       **42.**    Further, as the CEO and director of Genutec, Mr. Danna stood in the position of a

23   trustee of the assets of Genutec.

24       **43.**    However, as set forth above, Mr. Danna breached this fiduciary duty and engaged in

25   numerous acts of fraud and self-dealing while acting in his capacity as CEO and director of

26   Genutec.  As a result of this misconduct, Mr. Danna's debt to Genutec arises from "fraud or

27   defalcation while acting in a fiduciary capacity," within the meaning of 11 U.S.C. Section

28   523(a)(4) and therefore should be excepted from discharge

                                            10

**COMPLAINT TO DETERMINE DISCHARGEABILITY OF DEBT
AND OBJECT TO DEBTOR'S DISCHARGE**

## SECOND CLAIM FOR RELIEF

### [Against both Defendants for Objection to the Debtors' Discharge Based Upon Debtors' Knowing and Fraudulent False Oath and/or Account Which They Made in and/or Connection With This Bankruptcy Case]

### 11 U.S.C. § 727(a)(4)(A)

44.    Plaintiff hereby incorporates by reference paragraphs 1 through 43, and realleges these paragraphs as though set forth in full and in their entirety herein.

45.    Defendants have knowingly and fraudulently, in or in connection with the case made false oaths and presented or used false claims.

46.    Since the Petition Date, Defendants have continued in deceitful manner and made numerous false oaths. Such false oaths include, but are not limited to, their ownership interest in PAR Group, LLC, Mr. Danna's status as a director of Alentus Corporation and manager of PAR Group, LLC, the existence and/or disposition of Defendants' and PAR Group LLC's bank accounts, cash on hand, stock, proceeds from stock, income, hobby equipment, and profit earned from the sale of real estate.

47.    Based on Defendants' continued fraudulent and deceitful actions as set forth above, pursuant to 11 U.S.C. Section 727(a)(4)(A), Defendants' discharge may be denied.

## THIRD CLAIM FOR RELIEF

### [Against Both Defendants for Objection to the Debtor's Discharge Based Upon Debtor's Withholding Recorded Information, Including Books And Documents]

### 11 U.S.C. § 727(a)(4)(D)

48.    Plaintiff hereby incorporates by reference paragraphs 1 through 47, and realleges these paragraphs as though set forth in full and in their entirety herein.

49.    Plaintiff is informed and believes and thereon alleges that Defendants have knowingly and fraudulently, in or in connection with the case withheld from the Trustee recorded information, including books, documents, records and papers relating to the Defendants' property and financial affairs.

50.    Based on Defendants' continued fraudulent and deceitful actions as set forth above,

11

LAW OFFICES OF
M. CANDICE BRYNER
A PROFESSIONAL
CORPORATION

**COMPLAINT TO DETERMINE DISCHARGEABILITY OF DEBT
AND OBJECT TO DEBTOR'S DISCHARGE**

1 | pursuant to 11 U.S.C. Section 727(a)(4)(D), Defendants' discharge may be denied.

2 | **FOURTH CLAIM FOR RELIEF**

3 | **[Against Both Defendants for Objection to the Debtors' Discharge Based Upon Debtors'**

4 | **Concealment, Destruction, Falsified, Failure To Preserve Documents From Which Debtors'**

5 | **Financial Condition Can Be Ascertained]**

6 | **11 U.S.C. § 727(a)(3)**

7 | 51.    Plaintiff hereby incorporates by reference paragraphs 1 through 50, and realleges

8 | these paragraphs as though set forth in full and in their entirety herein.

9 | 52.    Plaintiff is informed and believes and thereon alleges that Defendants have concealed,

10 | destroyed, mutilated, falsified, or failed to keep or preserve recorded information, including

11 | books, documents, records and papers from which the Defendants' financial condition or

12 | business transactions might be ascertained.

13 | 53.    Based on Defendants' continued fraudulent and deceitful actions as set forth above,

14 | pursuant to 11 U.S.C. Section 727(a)(3), Defendants' discharge may be denied.

15 | **FIFTH CLAIM FOR RELIEF**

16 | **[Against Both Defendants for Objection to the Debtor's Discharge Based Upon Debtor's**

17 | **Failure to Explain Satisfactorily Any Loss Of Assets]**

18 | **11 U.S.C. § 727(a)(5)**

19 | 54.    Plaintiff hereby incorporates by reference paragraphs 1 through 53, and realleges

20 | these paragraphs as though set forth in full and in their entirety herein.

21 | 55.    Defendants have failed to adequately explain the loss of assets to meet their liabilities.

22 | Plaintiff is informed and believes and thereon alleges that Defendants have failed to list all of

23 | their assets including shares of stock in Alentus Corporation and their ownership interest in Par

24 | Group, LLC, hobby equipment, stock, proceeds from the sale or transfer of stock, cash on hand,

25 | income, businesses, bank accounts, profit from the sale of their home and other assets.

26 | Defendants claim to no longer have these assets as of the date of his Petition. However,

27 | Defendants have failed to explain satisfactorily the disposition of the assets and the deficiency of

28 | these assets to meet Defendants' liabilities.

12

**COMPLAINT TO DETERMINE DISCHARGEABILITY OF DEBT
AND OBJECT TO DEBTOR'S DISCHARGE**

56.   Based on Defendants' continued fraudulent and deceitful actions as set forth above, pursuant to 11 U.S.C. Section 727(a)(5), Defendants discharge may be denied.

### SIXTH CLAIM FOR RELIEF

**[Against Both Defendants for Objection to the Debtor's Discharge Based Upon Debtors' Intent to Hinder, Delay or Defraud, Failure by Transferring, Removing, Destroying or Concealing Property]**

**11 U.S.C. § 727(a)(2)(A)**

57.   Plaintiff hereby incorporates by reference paragraphs 1 through 56, and realleges these paragraphs as though set forth in full and in their entirety herein.

58.   Plaintiff is informed and believes and based thereon alleges that Defendants with the intent to hinder, delay or defraud the Trustee and creditors of the bankruptcy estate, have transferred, removed, destroyed, mutilated, or concealed, or has permitted, to be transferred, removed, destroyed, mutilated, or concealed property of the Debtor, within one (1) year before the Petition Date or Property of the estate, after the Petition Date.

59.   Plaintiff is informed and believes and based thereon alleges that Defendants have transferred, removed, or concealed the existence and/or disposition of Defendants' bank accounts, cash on hand, income, stocks, proceeds from the sale or transfer of stock, equity interests, hobby equipment, profit earned from the sale of real estate, and businesses.

60.   Based on Defendants' continued fraudulent and deceitful actions as set forth above, pursuant to 11 U.S.C. Section 727(a)(2)(A), Defendant's discharge may be denied.

**WHEREFORE**, the Plaintiff prays that this Court make and enter Judgment as follows:

### FOR THE FIRST CLAIM FOR RELIEF

1.   To deny the Mr. Danna's discharge with respect to Plaintiff's specific debt.

2.   For costs of suit incurred, including attorneys' fees as provided by applicable case law, statute and/or agreement of the parties.

3.   For such other relief as the Court deems just and proper.

13

**COMPLAINT TO DETERMINE DISCHARGEABILITY OF DEBT
AND OBJECT TO DEBTOR'S DISCHARGE**

1    <u>**FOR THE SECOND, THIRD, FOURTH, FIFTH, AND SIXTH CLAIMS FOR RELIEF**</u>

2         1.     To deny the Debtors' discharge.

3         2.     For costs of suit incurred, including attorneys' fees as provided by applicable case

4    law, statute and/or agreement of the parties.

5         3.     For such other relief as the Court deems just and proper.

6

7    DATED: January __17__, 2012

             THE LAW OFFICES OF M. CANDICE BRYNER, APC

8

             M. Candice Bryner

9                 Attorneys for Plaintiff Genutec Business Solutions, Inc.

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

14

**COMPLAINT TO DETERMINE DISCHARGEABILITY OF DEBT
AND OBJECT TO DEBTOR'S DISCHARGE**

LAW OFFICES OF
M. CANDICE BRYNER
A PROFESSIONAL
CORPORATION

FORM B104 (08/07)                                                                    2007 USBC, Central District of California

| ADVERSARY PROCEEDING COVER SHEET<br>(Instructions on Page 2) | ADVERSARY PROCEEDING NUMBER<br>(Court Use Only) |
|---|---|

| PLAINTIFFS<br>Genutec Business Solutions, Inc. | DEFENDANTS<br>Leon J. Danna and Patricia S. Danna |
|---|---|
| ATTORNEYS (Firm Name, Address, and Telephone No.)<br>Law Offices of M. Candice Bryner, APC<br>900 Roosevelt, Irvine, CA  92620<br>(949) 371-9056 - Tel. | ATTORNEYS (If Known)<br>Dale Parham; Winterbotham Parham & Teeple, a PC<br>4371 Latham St., Suite 105<br>Riverside, CA  92501  (951) 686-7717 |
| PARTY (Check One Box Only)<br>☐ Debtor          ☐ U.S. Trustee/Bankruptcy Admin<br>☑ Creditor       ☐ Other<br>☐ Trustee | PARTY (Check One Box Only)<br>☑ Debtor          ☐ U.S. Trustee/Bankruptcy Admin<br>☐ Creditor       ☐ Other<br>☐ Trustee |

**CAUSE OF ACTION** (WRITE A BRIEF STATEMENT OF CAUSE OF ACTION, INCLUDING ALL U.S. STATUTES INVOLVED)
Fraud and objection to discharge under 11 USC 727(a)(2) (3) (4) (5); 11 USC 523(a)(4)

## NATURE OF SUIT
(Number up to five (5) boxes starting with lead cause of action as 1, first alternative cause as 2, second alternative cause as 3, etc.)

**FRBP 7001(1) – Recovery of Money/Property**

☐ 11-Recovery of money/property - §542 turnover of property

☐ 12-Recovery of money/property - §547 preference

☐ 13-Recovery of money/property - §548 fraudulent transfer

☐ 14-Recovery of money/property - other

**FRBP 7001(2) – Validity, Priority or Extent of Lien**

☐ 21-Validity, priority or extent of lien or other interest in property

**FRBP 7001(3) – Approval of Sale of Property**

☐ 31-Approval of sale of property of estate and of a co-owner - §363(h)

**FRBP 7001(4) – Objection/Revocation of Discharge**

☒ 41-Objection / revocation of discharge - §727(c),(d),(e)

**FRBP 7001(5) – Revocation of Confirmation**

☐ 51-Revocation of confirmation

**FRBP 7001(6) – Dischargeability**

☐ 66-Dischargeability - §523(a)(1),(14),(14A) priority tax claims

☐ 62-Dischargeability - §523(a)(2), false pretenses, false
representation, actual fraud

☒ 67-Dischargeability - §523(a)(4), fraud as fiduciary, embezzlement,
larceny

**(continued next column)**

**FRBP 7001(6) – Dischargeability (continued)**

☐ 61-Dischargeability - §523(a)(5), domestic support

☐ 68-Dischargeability - §523(a)(6), willful and malicious injury

☐ 63-Dischargeability - §523(a)(8), student loan

☐ 64-Dischargeability - §523(a)(15), divorce or separation obligation
(other than domestic support)

☒ 65-Dischargeability - other

**FRBP 7001(7) – Injunctive Relief**

☐ 71-Injunctive relief – imposition of stay

☐ 72-Injunctive relief – other

**FRBP 7001(8) Subordination of Claim or Interest**

☐ 81-Subordination of claim or interest

**FRBP 7001(9) Declaratory Judgment**

☐ 91-Declaratory judgment

**FRBP 7001(10) Determination of Removed Action**

☐ 01-Determination of removed claim or cause

**Other**

☐ SS-SIPA Case – 15 U.S.C. §§78aaa et.seq.

☐ 02-Other (e.g. other actions that would have been brought in state
court if unrelated to bankruptcy case)

| ☑ Check if this case involves a substantive issue of state law | ☐ Check if this is asserted to be a class action under FRCP 23 |
|---|---|
| ☐ Check if a jury trial is demanded in complaint | Demand  $ 20,000,000.00 |

**Other Relief Sought**
Punitive damages

FORM B104 (08/07), page 2                                                    2007 USBC, Central District of California

## BANKRUPTCY CASE IN WHICH THIS ADVERSARY PROCEEDING ARISES

| NAME OF DEBTOR | BANKRUPTCY CASE NO. |
|---|---|
| Leon J. Danna and Patricia S. Danna | 6:11-bk-41390 |

| DISTRICT IN WHICH CASE IS PENDING | DIVISIONAL OFFICE | NAME OF JUDGE |
|---|---|---|
| Central District of California | Riverside | Hon. Deborah Saltzman |

### RELATED ADVERSARY PROCEEDING (IF ANY)

| PLAINTIFF | DEFENDANT | ADVERSARY PROCEEDING NO. |
|---|---|---|
| | | |

| DISTRICT IN WHICH ADVERSARY IS PENDING | DIVISIONAL OFFICE | NAME OF JUDGE |
|---|---|---|
| | | |

SIGNATURE OF ATTORNEY (OR PLAINTIFF)

| DATE | PRINT NAME OF ATTORNEY (OR PLAINTIFF) |
|---|---|
| 1/17/12 | M. Candice Bryner |

## INSTRUCTIONS

The filing of a bankruptcy case creates an "estate" under the jurisdiction of the bankruptcy court which consists of all of the property of the debtor, wherever that property is located. Because the bankruptcy estate is so extensive and the jurisdiction of the court so broad, there may be lawsuits over the property or property rights of the estate. There also may be lawsuits concerning the debtor's discharge. If such a lawsuit is filed in a bankruptcy court, it is called an adversary proceeding.

A party filing an adversary proceeding must also must complete and file Form 104, the Adversary Proceeding Cover Sheet, unless the party files the adversary proceeding electronically through the court's Case Management/Electronic Case Filing system (CM/ECF). (CM/ECF captures the information on Form 104 as part of the filing process.) When completed, the cover sheet summarizes basic information on the adversary proceeding. The clerk of court needs the information to process the adversary proceeding and prepare required statistical reports on court activity.

The cover sheet and the information contained on it do not replace or supplement the filing and service of pleadings or other papers as required by law, the Bankruptcy Rules, or the local rules of court. The cover sheet, which is largely self-explanatory, must be completed by the plaintiff's attorney (or by the plaintiff if the plaintiff is not represented by an attorney). A separate cover sheet must be submitted to the clerk for each complaint filed.

**Plaintiffs** and **Defendents.** Give the names of the plaintiffs and defendants exactly as they appear on the complaint.

**Attorneys.** Give the names and addresses of the attorneys, if known.

**Party.** Check the most appropriate box in the first column for the plaintiffs and the second column for the defendants.

**Demand.** Enter the dollar amount being demanded in the complaint.

**Signature.** This cover sheet must be signed by the attorney of record in the box on the second page of the form. If the plaintiff is represented by a law firm, a member of the firm must sign. If the plaintiff is pro se, that is, not presented by an attorney, the plaintiff must sign.